**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

GLAZER CAPITAL MANAGEMENT, LP;
GLAZER OFFSHORE FUND LTD. "The
Glazer Funds,"

*Plaintiffs-Appellants,*

v.

SERGIO MAGISTRI; ROSS
MULHOLLAND; INVISION
TECHNOLOGIES INC. SECURITIES
LITIGATION,

*Defendants-Appellees.*

No. 06-16899

D.C. No.
CV-04-02181-MJJ

OPINION

Appeal from the United States District Court
for the Northern District of California
Martin J. Jenkins, District Judge, Presiding

Argued and Submitted
June 13, 2008—San Francisco, California

Filed November 26, 2008

Before: J. Clifford Wallace and Susan P. Graber,
Circuit Judges, and George P. Schiavelli,* District Judge.

Opinion by Judge Wallace

---

*The Honorable George P. Schiavelli, United States District Judge for
the Central District of California, sitting by designation.

15761

---

## COUNSEL

Jeffrey S. Abraham, Abraham Fruchter & Twersky LLP, New York, New York, for the plaintiffs-appellants.

Susan S. Muck, Fenwick & West LLP, San Francisco, California, for the defendants-appellees.

---

## OPINION

WALLACE, Senior Circuit Judge:

Glazer Capital Management, LP and Glazer Offshore Fund Ltd. (Glazer) appeal from the district court's August 31, 2006 judgment of dismissal. Glazer's claims arose after InVision Technologies, Inc. (InVision) announced, in March 2004, that

it had entered into a merger agreement with General Electric (GE). Several months later, in July 2004, InVision issued a press release, casting doubt on the merger because of the discovery of potential violations of the Foreign Corrupt Practices Act of 1997(FCPA), 15 U.S.C. § 17dd-1. Although the proposed merger ultimately was consummated, the July 2004 announcement resulted in an immediate drop in InVision's share price. A class action complaint was filed by InVision shareholders and Glazer was appointed lead plaintiff.

To support the shareholders' claim, Glazer focused on three alleged misstatements in the sixty-page merger agreement, which InVision had included as an attachment to its Form 10-K filed pursuant to section 13 of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. § 78m. Those alleged misstatements appeared in the "representations and warranties" section of the merger agreement. The district court concluded that Glazer had not adequately pled either falsity or scienter with respect to these alleged misstatements and dismissed Glazer's action. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## I.

Prior to 2004, InVision was a publicly traded company engaged in the manufacture and sale of explosives detection systems (EDS). InVision sold EDS to airports for use in screening checked baggage. From the company's inception in 1990 through 2003, it shipped more than 1000 EDS to customers in the United States and abroad. Approximately 80% of InVision's sales were made domestically, while 20% were made to foreign clients in many parts of the world. For sales outside the United States, InVision marketed its products through the use of authorized foreign agents and distributors.

InVision's business grew steadily during the company's first decade. After September 11, 2001, however, demand for EDS increased dramatically worldwide. In 2003, InVision

entered into discussions regarding a possible merger with GE. On March 15, 2004, InVision formally announced that it would be acquired by GE in a cash transaction for $50 per share. The press release announcing the merger stated that the "acquisition is subject to normal closing conditions, including customary regulatory approval." That same day, the company filed a Form 10-K and attached a copy of its merger agreement. The merger agreement was signed by Sergio Magistri, InVision's President and Chief Executive Officer (CEO), and Donald Mattson, its Chief Operating Officer (COO).

Several months later, on July 30, 2004, InVision issued a press release stating that an internal investigation had revealed possible violations of the FCPA in connection with certain foreign sales transactions. InVision announced that it had voluntarily reported the activities to the Securities and Exchange Commission (SEC) and the Department of Justice (DOJ), but warned that subsequent investigations could potentially delay or terminate the merger. Following the announcement, the price of InVision stock dropped by more than six dollars per share.

A few days after InVision's announcement, shareholders filed a class action complaint in the Northern District of California. Glazer was appointed lead plaintiff, representing a putative class of investors who purchased InVision stock between March 15, 2004, when InVision announced the merger, and July 30, 2004, when it announced the potential FCPA violations.

On December 6, 2004, InVision announced that it had entered into a non-prosecution agreement with the DOJ and had agreed to pay a fine of $800,000. The announcement also reported that InVision had submitted an offer of settlement to the SEC, which the SEC staff had agreed to recommend. That same day, GE consummated the merger.

On February 14, 2005, the SEC issued a cease-and-desist order formally accepting InVision's settlement offer. The

SEC's order gave specific details about InVision's FCPA violations, including that it authorized payments to foreign sales agents in China, the Philippines, and Thailand, despite knowing the "high probability" that those funds would be used to make improper payments to local government officials. The SEC also faulted InVision for failing to maintain proper internal controls and for failing to train its foreign distributors and sales agents adequately.

Following the SEC's announcement, Glazer filed an Amended Consolidated Complaint with citations to the FCPA settlements. On January 24, 2006, the district court granted InVision's motion to dismiss the complaint, but allowed Glazer leave to amend. Glazer filed a Second Amended Consolidated Complaint on February 22, 2006. InVision again moved to dismiss, and the district court heard arguments. A few weeks later, the SEC announced that it had settled charges against InVision's former senior vice president for sales and marketing, David M. Pillor, for his role in the company's FCPA violations. Ten days later, Glazer sought leave to amend its complaint for a third time, in order to add allegations against Pillor. The district court denied Glazer's request to amend its complaint, dismissed the Second Amended Consolidated Complaint, and entered a judgment dismissing the action. The present appeal followed.

II.

**[1]** Glazer alleges that InVision, along with its CEO and Chief Financial Officer (CFO), violated section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. To state a claim under Rule 10b-5, a plaintiff must demonstrate "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *Sparling v. Daou (In re Daou Sys., Inc.)*, 411 F.3d 1006, 1014 (9th Cir. 2005). Under the heightened pleading standard of the Private Securi-

ties Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4(b)(1), complaints alleging misrepresentations or omissions under 10b-5 must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."

## A.

We first consider InVision's argument that the mere context of the three alleged misstatements renders them legally incapable of supporting a securities fraud claim, and that we need go no further. InVision contends that because the statements appeared in the representations and warranties section of a private merger agreement directed solely to GE, the statements could not reasonably have been interpreted as factual communications *to investors*. To support this argument, InVision refers to a passage in the merger agreement which provides that the agreement was "not intended to . . . confer upon any [p]erson other than the parties hereto any rights or remedies hereunder." InVision also refers to a separate section of the merger agreement, which rendered the entire agreement expressly subject to a disclosure schedule. Because that disclosure schedule was never released to the public, InVision argues that no reasonable investor would have relied on the representations and warranties contained in the merger agreement.

[2] The context of InVision's alleged misstatements is certainly relevant to the issue of scienter, as discussed later. However, we do not accept InVision's argument that the mere context of the statements is enough to render these statements inactionable *as a matter of law*. InVision's proposed merger with GE was a very significant event for the company. InVision could have expected intense investor interest in the details of the merger, particularly from institutional investors

like Glazer. The mere fact that the company chose to communicate the details of the merger in the form of an attachment to its publicly-filed Form 10-K, as opposed to in the body of the document itself, cannot work as a *per se* bar to securities law liability. Moreover, that the merger agreement was a private document and included reference to a non-public disclosure schedule would not, as a matter of law, prevent a reasonable investor from relying on its terms. Therefore, we must move on to examine the substance of Glazer's 10b-5 pleading.

## B.

The first step in our 10b-5 analysis requires us to determine whether Glazer has adequately pled facts showing InVision's representations to be false or misleading. 17 C.F.R. § 240.10b-5. Glazer identifies three alleged misstatements in the merger agreement.

First, section 3.8(a) of the agreement broadly warrants that InVision is "in compliance in all material respects with all laws . . . ." Second, section 3.5(d) provides that InVision is in compliance with the books and records provision of Section 13(b) of the Exchange Act, 15 U.S.C. § 78m(b)(2). Finally, section 3.5(d) provides: "Neither the Company . . . nor, to the Knowledge of the Company, any director, officer, agent, employee or other Person acting on behalf of the Company" has violated the anti-bribery provisions of Section 30A of the Exchange Act, 15 U.S.C. § 78dd-1.

To plead falsity properly under the PSLRA, Glazer was required to "specify each statement alleged to have been misleading," and provide "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). If we were to accept the sweeping scope of the warranty contained in sections 3.8(a), Glazer could probably meet this standard merely by demonstrating that InVision was in violation of *any* law at the time the warranty was made.

The district court, however, did not read section 3.8(a) so broadly. The court held that the broad representation at the start of section 3.8(a) was implicitly modified by the following sentence, which appeared later in the same section of the agreement:

> Since January 1, 2002, neither the Company nor any of its Subsidiaries has received written notice to the effect that a Governmental Authority claimed or alleged that the Company . . . was not in compliance . . . with any Law applicable to the Company . . . .

The district court read this section as welding a *knowledge* element onto the broad warranty contained at the start of section 3.8(a). Under this interpretation, InVision was not warranting that it was in compliance with all laws; merely that it was in compliance with all laws, *as far as it knew then*. This interpretation is not directly supported by the text of the merger agreement, and it appears to conflate the issue of scienter with the issue of falsity. Moreover, the district court did not address the other alleged misstatements contained in section 3.5(d).

[3] Under the plain language of the merger agreement, InVision warranted that it was "in compliance in all material respects with all laws," and more specifically, that it was "in compliance in all material respects with the provisions of Section 13(b) of the Exchange Act."] Glazer has pled facts demonstrating that InVision was *not* in compliance with Section 13(b) of the Exchange Act at the time the warranties were made: the SEC cease and desist order of February 14, 2005 stated that "InVision violated Section 13(b)(2)(A) by improperly recording in its books and records payments it made [in violation of the FCPA]" and that InVision "violated Section 13(b)(2)(B) by failing to devise and maintain an effective system of internal controls to prevent and detect violations of the FCPA." Therefore, we conclude that Glazer has satisfied the

pleading requirements of the PSLRA with respect to the issue of falsity.

Whether Glazer has adequately pled falsity with respect to InVision's third alleged misstatement in section 3.5(d) is a closer question, but it is a question we need not decide. As discussed later, even if Glazer properly pled falsity, the district court's dismissal would still be appropriate if Glazer failed to plead scienter adequately with respect to the three statements.

### C.

**[4]** The next step in our 10b-5 analysis is to determine whether Glazer has properly pled the element of scienter, defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976). To plead scienter properly under the PSLRA, Glazer was required to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). Such an inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2504-05 (2007). As we described in *Janas v. McCracken (In re Silicon Graphics Inc. Securities Litigation)*, "plaintiffs proceeding under the PSLRA can no longer aver intent in general terms of mere 'motive and opportunity' or 'recklessness,' but rather, must state specific facts indicating no less than a degree of recklessness that strongly suggests actual intent." 183 F.3d 970, 979 (9th Cir. 1999).

The three alleged misstatements on which Glazer relies to show scienter all appeared in the merger agreement. The agreement was signed by two InVision officers, but Glazer has alleged scienter only on the part of one of them, Sergio Magistri. Glazer also alleges scienter on the part of Ross Mul-

holland, InVision's CFO, based on his sworn Sarbanes-Oxley certification included with InVision's Form 10-K. We will discuss later whether this certification is sufficient to meet the scienter pleading requirements of the PSLRA.

**[5]** The first issue we must consider, then, is whether Glazer was required to plead scienter as to Magistri as an individual, or whether it can rely on a theory of "collective scienter," which would hold the company as a whole responsible for the statements contained in the merger agreement.

1.

Glazer urges us to follow the Second and Seventh Circuits in adopting a theory of "collective scienter" for purposes of PSLRA pleading. As the Second Circuit described in *Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.*:

> In most cases, the most straightforward way to raise [an inference of scienter] for a corporate defendant will be to plead it for an individual defendant. But it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant.

531 F.3d 190, 195 (2d Cir. 2008). The Seventh Circuit reached a similar conclusion in *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, holding that "it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud." 513 F.3d 702, 710 (7th Cir. 2008). To illustrate the point, the court gave the following example:

> Suppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement

> would have been approved by corporate officials
> sufficiently knowledgeable about the company to
> know that the announcement was false.

*Id.*; *see also Caterpillar, Inc. v. Great Am. Ins. Co.*, 62 F.3d
955, 962 (7th Cir. 1995) (stating, in dictum, "there are con-
ceivable situations where the individual actors would not be
liable but their corporate employer would be, for example
where a case depends on the collective scienter of its employ-
ees").

Other circuits have disagreed with the collective scienter
theory of liability. In *Southland Securities Corp. v. INSpire
Insurance Solutions Inc.*, the Fifth Circuit rejected the concept
of "group pleading" whereby plaintiffs could presume "that
statements in prospectuses, registration statements, annual
reports, press releases, or other group-published information,
are the collective work of those individuals with direct
involvement in the everyday business of the company." 365
F.3d 353, 363-64 (5th Cir. 2004) (internal quotation marks
omitted). The court concluded that the "group pleading doc-
trine conflicts with the scienter requirement of the PSLRA"
because "the PSLRA requires . . . plaintiffs to distinguish
among those they sue and enlighten *each defendant* as to his
or her particular part in the alleged fraud." *Id.* at 365 (internal
quotation marks omitted). The Eleventh Circuit reached a
similar conclusion in *Phillips v. Scientific-Atlanta, Inc.*, when
it stated in dictum that "the most plausible reading [of the
PSLRA] in light of congressional intent is that a plaintiff, to
proceed beyond the pleading stage, must allege facts suffi-
ciently demonstrating each defendant's state of mind regard-
ing his or her alleged violations." 374 F.3d 1015, 1018 (11th
Cir. 2004) (footnote omitted).

Our circuit has not previously adopted a theory of collec-
tive scienter. In *Nordstrom, Inc. v. Chubb & Son, Inc.*, we
touched on the issue indirectly in the context of an insurance
dispute. 54 F.3d 1424 (9th Cir. 1995). There the plaintiff

sought to compel payment on an insurance policy covering the actions of its directors and officers. The dispute arose after a group of shareholders brought suit against the directors and officers of Nordstrom and successfully obtained a $7.5 million settlement. The defendant insurance company refused to cover one-half of the settlement on the ground that the shareholders' lawsuit had named *both* the directors and officers, who were insured, as well as Nordstrom, which was not insured. The defendant argued that because Nordstrom could have been found liable *independent* of the actions of its directors and officers, the insurance policy covered only one-half of the settlement. We rejected this argument and held that "there is no case law supporting an independent 'collective scienter' theory." *Id.* at 1435. We then concluded that "corporate scienter relies heavily on the awareness of the directors and officers," and that on the facts of the case, "we see no way that [the defendant] could show that the corporation, but not any individual [director or officer], had the requisite intent to defraud." *Id.* at 1436.

At least one district court in our circuit has also discussed the issue of collective scienter. In *In re Apple Computer, Inc.*, the court cited *Nordstrom* and concluded that "[t]he Ninth Circuit has rejected the concept of 'collective scienter.' " 243 F. Supp. 2d 1012, 1023 (N.D. Cal. 2002). The court went on to hold:

> It is not enough to establish fraud on the part of a corporation that one corporate officer makes a false statement that another officer knows to be false. A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter . . . .

*Id., citing Nordstrom*, 54 F.3d at 1435-36. The district court in *Apple* appears to have overstated our holding in *Nordstrom*. We had at that time not categorically rejected the concept of

"collective scienter." Rather, *Nordstrom* merely held that, on the facts of the case, it was impossible to allege corporate scienter without also implicating the directors and officers. *Nordstrom* does not foreclose the possibility that, in certain circumstances, some form of collective scienter pleading might be appropriate. For instance, as outlined in the hypothetical posed in *Makor*, there could be circumstances in which a company's public statements were so important and so dramatically false that they would create a strong inference that at least *some* corporate officials knew of the falsity upon publication. *See Makor*, 513 F.3d at 710.

**[6]** We need not decide whether we agree with *Makor* because the facts of this case are different from the hypothetical in *Makor*. Glazer rests its securities fraud claim on three statements, all of which appear in a sixty-page legal document. If the doctrine of collective scienter excuses Glazer from pleading individual scienter with respect to these legal warranties, then it is difficult to imagine what statements would *not* qualify for an exception to individualized scienter pleadings. In fact, because the merger agreement warranted that the company was in compliance "with all laws," then under the collective scienter theory urged by Glazer, so long as *any* employee at InVision had knowledge of the violation of *any* law, scienter could be imputed to the company as a whole. This result would be plainly inconsistent with the pleading requirements of the PSLRA. We are thus not faced with whether, in some circumstances, it might be possible to plead scienter under a collective theory. That issue is not before us. Rather, given the limited nature and unique context of the alleged misstatements in this case, we hold that the PSLRA requires Glazer to plead scienter with respect to those individuals who actually made the false statements in the merger agreement. Therefore, to succeed on its claim, Glazer must "plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct" on the part of Magistri. *See In re Silicon Graphics*, 183 F.3d at 974.

In a final effort to meet the stringent FCPA requirements, Glazer moved to file a Third Amended Consolidated Complaint naming Pillor, the former senior vice president for sales and marketing at InVision. But Glazer was required to plead individual scienter with respect to Magistri because Magistri was responsible for actually making the statements in the merger agreement. As the district court correctly held in denying the motion, the fact that Glazer could have shown that a *different* executive knew about the FCPA violations would do nothing to resuscitate Glazer's claims. This ruling was not an abuse of discretion.

2.

Glazer has pled no facts that directly demonstrate Magistri possessed the requisite scienter when he made the representations contained in the merger agreement. Although the SEC and DOJ concluded that certain illegal payments were approved by InVision's regional sales manager and senior vice president for sales and marketing, Glazer has not pled any facts to demonstrate that Magistri was personally aware of the illegal payments or that he was actively involved in the details of InVision's Asian sales. Instead, Glazer asks us to infer scienter on the part of Magistri based on a number of factors, including (1) the nature of InVision's business, (2) the fact that Magistri signed a Sarbanes-Oxley certification required by Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, (3) the discovery of FCPA violations by GE during the due diligence process, (4) the personal financial incentives for Magistri to consummate the merger, and (5) the conclusions contained in the DOJ and SEC settlement documents. To determine whether Glazer has met the PSLRA pleading requirements, we must determine whether these five events, "even though individually lacking, are sufficient to create a strong inference" of scienter. *In re Daou*, 411 F.3d at 1022 (internal quotation marks omitted); *see also South Ferry LP, #2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) (holding that courts must consider scienter allegations "holistically").

First, Glazer argues that the very size and nature of InVision's business creates a strong inference that Magistri knew about the FCPA violations. In its complaint, Glazer describes InVision as a small company which sold a relatively small number of devices to a limited number of customers. The pleadings also allege that overseas sales formed an important part of the company's business, and point out that Magistri was able to name several of the company's overseas partners in Thailand and the Philippines. Glazer argues that we can therefore infer that Magistri, as CEO, knew about the FCPA violations when he signed the merger agreement.

We have had occasion to address arguments similar to Glazer's in the past. In *Daou*, a group of shareholders brought suit against five individual officers and directors of a company, alleging they systematically violated generally accepted accounting principles in order to inflate the company's stock price artificially. Plaintiffs alleged scienter, in part, based on the theory that the officers *must* have known about the accounting irregularities given their positions within the company and their roles in the day-to-day decision making. In responding to this argument, we held that "[g]eneral allegations of defendants' 'hands-on' management style, their interaction with other officers and employees, their attendance at meetings, and their receipt of unspecified weekly or monthly reports are insufficient" to create a strong inference of scienter. *Id.* at 1022, *citing Fischer v. Vantive Corp. (In re Vantive Corp. Sec. Litig.)*, 283 F.3d 1079, 1087 (9th Cir. 2002). However, we cautioned that "specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database are factors in favor of inferring scienter . . . ." *Id., citing Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004). Against this backdrop, we concluded in *Daou* that the plaintiffs had sufficiently pled scienter, based on the officers' "direct involvement in the production of false accounting statements," as well as their suspicious insider stock sales.

[7] We confronted the same argument more recently in *Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982 (9th Cir. 2008). There, shareholders filed a securities fraud class action against Applied Signal and two of its officers, after the company announced an unexpected 25% drop in revenue. At issue were certain "stop-orders" received from Berson's customers, which the company failed to report accurately to investors. On the issue of scienter, plaintiffs did not allege any specific facts showing that the individually named officers actually *knew* about the stop-work orders. Nevertheless, we held that plaintiffs had adequately demonstrated a "strong inference" of scienter, based on the officers' positions and the nature of the misstatements. In particular, we concluded the named officers "were directly responsible for Applied Signal's day-to-day operations" and that the stop-work orders "were prominent enough that it would be 'absurd to suggest' that top management was unaware of them." *Id.* at 988-89, *citing No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West*, 320 F.3d 920, 943 n.21 (9th Cir. 2003).

[8] The facts of this case are quite different. The alleged misstatements here involved a discrete set of illegal payments made by InVision's foreign sales agents operating in China, the Philippines, and Thailand. Unlike the misstatements in *Daou* and *Berson*, these payments were not, by their nature, the type of transaction of which it would be "hard to believe" senior officials were unaware. *Berson*, 527 F.3d at 989. To the contrary, the surreptitious nature of the transactions creates an equally strong inference that the payments would have deliberately been kept secret—even within the company. This inference is supported by the fact that the sales and marketing director responsible for approving the payments received the bulk of his salary from commissions earned on sales. Based on the allegations made in this case, it would not be "absurd to suggest" that Magistri was unaware of the details of payments made through foreign sales agents in Asia. *Id.* Therefore, we hold that given the nature of the alleged

misstatements, the mere size and nature of InVision's business are not sufficient to create a strong inference of scienter.

Glazer next points to the Sarbanes-Oxley certification which Magistri and InVision's CFO, Ross Mulholland, signed and attached to the company's Form 10-K. In that certification, Magistri and Mulholland stated:

> The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures . . . and have:
>
> (a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant . . . is made known to us . . . ;
>
> (b)   Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures . . . .

Glazer argues that this statement is sufficient to infer knowledge of the FCPA violations, because the controls and procedures put into place by Magistri and Mulholland would have necessarily alerted them to any FCPA violations.

[9] Our circuit has yet to examine the precise interplay between the reporting requirements of Sarbanes-Oxley and the scienter pleading requirements of the PSLRA. However, at least two other circuits have specifically addressed the issue. In *Garfield v. NDC Health Corp.*, the Eleventh Circuit rejected the plaintiffs' argument that Sarbanes-Oxley certifications signed by senior executives were sufficient to demonstrate scienter. 466 F.3d 1255, 1267 (11th Cir. 2006). The court held:

The plain language of Sarbanes-Oxley evidences no congressional intent to alter the pleading requirements set forth in the PSLRA. . . . If we were to accept [the plaintiff's] proffered interpretation of Sarbanes-Oxley, scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA.

*Id.* at 1266. The Fifth Circuit recently reached a similar conclusion in *Indiana Electrical Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, explicitly adopting the holding of *Garfield*. 537 F.3d 527, 544-45 (5th Cir. 2008). We agree with the reasoning of the Eleventh and Fifth Circuits. Because Congress expressed no intent to alter the pleading requirements of the PSLRA, "Sarbanes-Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements." *Garfield*, 466 F.3d at 1266. Because Glazer has pled no facts to that effect, the Sarbanes-Oxley certifications are not sufficient, without more, to raise a strong inference of scienter on the part of Magistri.

**[10]** Glazer next argues that because GE was able to discover evidence of FCPA violations relatively early in the due diligence process, the information must have been readily available and therefore known to Magistri when he signed the merger agreement. This argument is not sufficient to create a strong inference of scienter. The mere fact that GE was able to discover the FCPA violations does not create a direct inference that Magistri personally knew about the violations. At most, it creates the inference that he *should* have known of the violations. This is not sufficient to meet the stringent scienter pleading requirements of the PSLRA. *See In re Silicon Graphics*, 183 F.3d at 977 (requiring "some degree of intentional or conscious misconduct").

Moreover, the material misrepresentations at issue in this case appeared in the public filing of a *private* merger agreement. This fact undercuts any inference that Magistri knew about the FCPA violations when he signed the merger agreement, because such knowledge would have required him to make false representations knowingly, not only to the investing public, but also to the very company that would shortly be conducting a due diligence inquiry.

**[11]** Glazer next argues that a strong inference of scienter arises from the fact that Magistri had a motive to make false statements, because he was positioned to profit personally from the proposed merger. Although neither side has cited any Ninth Circuit law on this issue, a number of out-of-circuit cases have rejected Glazer's argument. In *Phillips v. LCI International, Inc.*, the Fourth Circuit explained that because personal profit motive is present in almost every merger, inferring scienter from motive would "force the directors of virtually every company to defend securities fraud actions every time that company effected a merger or acquisition." 190 F.3d 609, 623 (4th Cir. 1999) (internal citation omitted). The Third Circuit echoed this sentiment in *GSC Partners CDO Fund v. Washington*, when it held that "[i]n every corporate transaction, the corporation and its officers have a desire to complete the transaction, and officers will usually reap financial benefits from a successful transaction. Such allegations alone cannot give rise to a 'strong inference' of fraudulent intent." 368 F.3d 228, 237-38 (3d Cir. 2004); *see also, Kalnit v. Eichler*, 264 F.3d 131, 139-40 (2d Cir. 2001) (holding that officers' motive to maintain or increase compensation was insufficient to support scienter); *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994) (holding that "incentive compensation can hardly be the basis on which an allegation of fraud is predicated"). We join our sister circuits and hold that evidence of a personal profit motive on the part of officers and directors contemplating a merger is insufficient to raise a strong inference of scienter.

[12] Finally, Glazer argues that the settlement agreements InVision entered into with the DOJ and SEC are sufficient to create a strong inference of scienter. In those agreements, InVision accepted responsibility for misconduct and admitted that the company "was aware of the high probability that its foreign sales agents or distributors paid or offered to pay something of value to government officials in order to obtain or retain business for InVision." The company further admitted that it "improperly accounted for certain payments . . . in its books and records in violation of the FCPA." The district court correctly held that these agreements were not sufficient to meet the pleading requirements of the PSLRA. First, the admissions in these settlement agreements were largely legal conclusions, rather than particularized facts giving rise to a strong inference of scienter. More importantly, even if InVision accepted the SEC's and DOJ's statements of fact, there is nothing in either settlement agreement that would support the conclusion that *Magistri* had actual knowledge of the violations. As discussed earlier, the mere fact that *someone* at InVision had knowledge of the illegal transactions is not sufficient to satisfy the scienter pleading requirements of the PSLRA, given the context and limited nature of the misrepresentations at issue.

Therefore, we hold that the five identified events, individually or collectively, fail "to create a strong inference" of scienter. *In re Daou*, 411 F.3d at 1022.

### III.

The district court did not err when it dismissed Glazer's Second Amended Consolidated Complaint, did not abuse its discretion when it denied leave to file a Third Amended Consolidated Complaint, and did not err when it entered a judgment dismissing the action. Glazer has not pled facts that would either directly or indirectly give rise to a strong inference of scienter on the part of those officers responsible for

making the false statements contained in the merger agreement.

**AFFIRMED.**